# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA          )
                                  )
            Plaintiff,            )          18-CR-02945-WJ
                                  )
                                  )
    vs.                           )
                                  )
SIRAJ WAHHAJ,                     )
                                  )
            Defendant,            )

**FILED**
UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

JUN 05 2023

MITCHELL R. ELFERS
CLERK

## MOTION FOR PRODUCTION OF GRAND JURY TRANSCRIPTS

**COME NOW,** Siraj Wahhaj Pro Se respectfully submits, a motion for the production of Grand Jury Transcripts under Rule 6(e)(ii). In support thereof, Defendant submits the following: The Court may authorize disclosure- at a time, in a manner, and subject to any conditions that it directs- of a grand- jury matter: (ii) at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury.

## INTRODUCTION

In recognition of the Grand Jury's status as an independent institution, courts afford Grand Jury proceedings a presumption of regularity. See United States v. Johnson, 319 U.S. 503, 512- 13 91943). " This presumption attaches even after the Grand jury has returned an initial indictment. After all, superseding indictments setting forth new charges or adding new defendants are familiar fare." United States v. Flemmi, 245 F.3d 24, 28 ( 1st Cir. 2001). A "' Grand Jury proceeding is accorded a presumption of regularity, which generally may be dispelled only upon particularized proof of irregularities in the Grand Jury process.'" United States v, R, Enters., 498 U.S. 292, 301 (199910 ( quoting United States v. Mechanik, 475 U.S. 66,75 (1986)( O' Connor, J., concurring)).

1

To be entitled to production, the defendant must show a " particularized need" for the documents that outweighs the public policy of Grand jury secrecy. United States v. Warren, 747 F. 2d 1339, 1347 ( 10th Cir. 1984).

## **FACTUAL BACKROUND**

1. On August 3, 2018, TCSO executed a warrant on Lot 28, Unit 2, Costilla Meadows Subdivision, Taos New Mexico and placed defendant into custody.

2. On August 31, 2018, the FBI filed a criminal complaint before the District Court of New Mexico charging Mr. Wahhaj with aiding an illegal alien in possession of a firearm, in violation of 18 U.S.C. 371. Mr Wahhaj was ordered  to remain in the custody of the United States Marshal Service, pending trial.

3. On September 11, 2018, a grand jury issued an indictment charging Mr. Wahhaj with conspiracy to provide an alien unlawfully in the United States with a firearm, in violation of 18 U.S.C. 371. On October  3, 2018, the Court designated the case complex for purposes of the Speedy Trial Act. (Doc.49) On September 12, 2018, magistrate judge kirtan khalas issued an order detaining Mr. Wahhaj pending trial. (Doc.36) On December 11, 2018 the Court issued a scheduling order setting forth deadlines in the case and trial for April 13, 2020. (Doc. 74) On March  14, 2019, a grand jury issued a superseding indictment, charging the defendants with a number of new charges, including providing materials support to terrorists. ( Doc. 85) On April 5, 2019, the Court issued an amended scheduling order which set new deadlines for motions but maintained the trial for April 13, 2020. (Doc. 95) On November 12, 2019, the parties filed a joint motion to amend the scheduling order. (Doc. 67)

4. On December 17, 2019, the Court issued a second stipulated order, scheduling trial for October 14, 2020. (Doc. 172) On February  18, 2020, the court issued an order staying all proceeding in this case due to competency evaluations that were underway as to Mr. Wahhaj's co- defendants.The stay was lifted on October 14, 2022. Mr. Wahhaj has been in pretrial detention for over 58 months.

## LAW REGARDING GRAND JURY TRANSCRIPTS

In recognition of the Grand Jury's status as an independent institution, courts afford Grand Jury proceedings a presumption of regularity. See United States v. Johnson, 319 U.S. 503, 512- 13 91943). " This presumption attaches even after the Grand jury has returned an initial indictment. After all, superseding indictments setting forth new charges or adding new defendants are familiar fare." United States v. Flemmi, 245 F.3d 24, 28 ( 1st Cir. 2001). A "' Grand Jury proceeding is accorded a presumption of regularity, which generally may be dispelled only upon particularized proof of irregularities in the Grand Jury process.'" United States v, R, Enters., 498 U.S. 292, 301 (199910 ( quoting United States v. Mechanik, 475 U.S. 66,75 (1986)( O' Connor, J., concurring)). To be entitled to production, the defendant must show a " particularized need" for the documents that outweighs the public policy of Grand jury secrecy. United States v. Warren, 747 F. 2d 1339, 1347 ( 10th Cir. 1984).

The  particularized need requirement, however, is not satisfied when a party attempts to engage in a fishing expedition in the hopes of discovering useful material. See United States v. Kim, 577 F.2d 473, 478 ( 9th Cir. 1978). " A simple desire for Grand Jury transcripts in the unsubstantiated hope that something might turn up is insufficient to require disclosure." United States v. Battle, 1997 WL 447814, at *18 ( D. Kan. June 27, 1997)( Crow, J.)

In Douglas Oil. Co. v. Petrol Stops Northwest, 441 U.S. 211 ( 1979), the Supreme Court sets forth the standard for reviewing whether Grand Jury transcript should be produced: Parties seeking grand jury transcripts under Rule 6(e) must show that the material they seek is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that their request is structured to cover only material so needed. Such a showing must be made even when the Grand Jury whose transcripts are sought has concluded its operations . . .   [T]he interest in Grand jury secrecy, although reduced, are not eliminated merely because the Grand jury has ended its activities. Douglas Oil, Co. v. Petrol Stops Nw., 411 U.S. At 222( footnotes omitted)

" Despite the strong policy of maintaining the secrecy of Grand Jury proceedings, in certain situations disclosure of Grand Jury minutes is appropriate where justice demands." United States v. Pottorf, 769 F. Supp. 1176, 1180 ( D. kan. 1991)( Saffels, J.). The decision whether the district should release Grand Jury transcripts is committed to the district court's sound discretion. See In re Lynde, 922 F.2d 1448, 1451 ( 10th Cir. 1991)

" The rule is as exacting when the defendant asks for the protected materials in order to challenge the propriety of the grand Jury proceedings. " United States v. Battle , 1997 WL 447814, at * 18. " Before disclosure of the Grand Jury transcripts, which would corroborate the Defendants' arguments[,] can be ordered, the Defendants must offer evidence of a substantial likelihood of gross or prejudicial irregularities in the conduct of the Grand jury.'" United States v. Cannistraro, 800 F. Supp. 30, 50 ( D.N.J. 1992) (Lechner, J.) ( quoting United States v. Budzanoski, 462 F. 2d 443, 454 ( 3d Cir. 1972)).  Mere speculation over what may have occurred is not enough to meet this burden or to overcome the presumption of regularity attached to Grand jury proceedings. See United States v. Santoro, 647 F. Supp. 153, 172-73 ( E.D.N.Y. 1986)( Mclauglin, J.), rev'd on other grounds, Unites States v. Davidoff, 845 F. 2d 1151 (2d Cir. 1988).

" Notwithstanding the presumption of regularity, prosecutions do not have carte blanche in Grand jury matters." United States v. Flemmi, 245 F. 3d at 28. However, a party asserting a claim of Grand jury abuse must shoulder a heavy burden. One way to carry this burden is to show that the government used the Grand jury principally to prepare pending charges for trial." United States v. flemmi, 245 F. 3d at 28. the United States may not use the Grand jury solely to bolster its case, " although this may be an incidental benefit." United States v. Gibbsons, 607 F. 2d 1320, 1328 ( 10th Cir. 1970)

( " [ i]t is improper to use the Grand Jury for the primary purpose of strengthening the Government's case on a pending indictment or as a substitute for discovery.")

" However, where there is another legitimate purpose behind the Grand jury investigation, the proceeding would not be improper merely because the Government may derive an incidental benefit." Unites States v. Gibbsons, 607 F.2d at 1328( holding that the defendant did not show an abuse of the Grand jury system, because he did" not demonstrate[ ] that [ a witness'] testimony before the Grand jury was for sole or dominant purpose of preparing a pending indictment for trial").

Accord United States v. Woods, 5444 F.2d 242 ( 6th Cir. 1976)( " [S]o long as it is not the sole or dominant purpose of the Grand Jury to discover facts relating to ( a defendant's ) pending indictment, the Court may not interfere with the Grand Jury's investigation.")

These proposition are more simply stated than applied. See United States v. Flemmi, 245 F. 3d at 28. In United States v. Flemmi, the United States court of Appeals for the first Circuit recognized that there is a fine line between an improper " trial preparation " use of a Grand jury and a proper " continuing investigation" use. This fine line is difficult to plot and, in most instances, determining whether a prosecutor has overstepped it will depend on the facts and circumstances of the particular case.

To assist in the inquiry, courts have devised certain proxies. Thus, if a Grand Jury's continuing indagation results in the indictment of parties not previously charged, the presumption of regularity generally persists. United States v. Gibbons, 607 F.2d 1320, 1328-29 (10th Cir. 1970). So too when the Grand Jury's investigation leads to filing of additional charges against previously indicted defendants. In re Grand Jury Proceeding ( Johanson), 632 F. 2d 1033, 1041 ( 3d Cir. 1980)

These purposes befitting the accepted institutional objectives of the Grand jury, and their presence bears convincing witness to the property of the prosecutor's stewardship. See United States v. Sasso, 59 F.3d 341, 351-52 ( 2d Cir. 1995); In re Maury Santiago, 533 F.2d 727, 730 ( 1st Cir. 1976); United States v. Dardi, 330 F.2d 316, 336 ( 2d cir. 1964). United States v. Flemmi, 245 F.3d at 28.

Defendant is requesting for production of the Grand Jury transcripts in order to challenge the propriety of the Grand Jury proceedings.

The Supreme Court sets forth the standard for reviewing whether Grand Jury transcript should be produced: Parties seeking grand jury transcripts under Rule 6(e) must show that the material they seek is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that their request is structured to cover only material so needed. Such a showing must be made even when the Grand Jury whose transcripts are sought has concluded its operations . ...   [T]he interest in Grand jury secrecy, although reduced, are not eliminated merely because the Grand jury has ended its activities. Defendant outlines the following:

1. The material defendant is seeking is needed to avoid a possible injustice in another judicial proceeding.

2. The need for disclosure is greater than the need for continued secrecy.

3. Defendant's request is structured to cover only material needed.

5

Defendant has been in detention for almost 5 years. On September 12, 2018, magistrate judge kirtan khalas issued an order detaining Mr. Wahhaj pending trial. (Doc.36) This detention was based on the grand jury finding of probable cause to indict defendants. This case was illegal from the inception, defendant has to dismantle it step by step because prior counsel refused to do so. The first charge against defendants was aiding an illegal alien in possession of a firearm, in violation of 18 U.S.C. 371. This is predicated on Jany's immigration status if she was in the country illegally or not. How can she be in the country illegally when the government gave her permission to work each year by granting her Employment Authorization Document ("EAD") status. Which she filed for and was granted continuously from 2007 until it expired in April 16, 2018. A neutral an impartial grand jury could have easily came to that conclusion if they were provided with truthful information which they were not.

It is easy to deduce from that, because SA Garcia intentionally and recklessly left Jany's true immigration status from the criminal complaint, which SA Taylor the case agent knew it was false that is why he did not swear to it. If SA Taylor wanted to show a good faith effort he would have told the truth when Mr Kraehe asked him about Jany's status. He would have not stated she was here illegally and out of status for 20 years. He did not because he was a willing collaborator. The government needed justification in order to legally detain defendants while they continued to build their case. What is very troubling is prior counsel knew Jany's immigration status and never challenged the original indictment. This caused defendants irreparable harm.

Defendant personally witness Jany applying for and was granted her EAD authorization continuously each year. On one occasion she complained that the application double from $250 to $500 in one year. If this pertinent information was intentionally left out of the grand jury, this caused defendants prejudice. Again this is exculpatory evidence that the government provided to defendant in his discovery, he did not pulled this out of the air. The government used the grand jury as a fishing expedition and to detain defendants while the FBI furthered the investigation.

However, a party asserting a claim of Grand jury abuse must shoulder a heavy burden. One way to carry this burden is to show that the government used the Grand jury principally to prepare pending charges for trial. The initial charge of 18 U.S.C. 371. On September 11, 2018, a grand jury issued an indictment charging Mr. Wahhaj with conspiracy to provide an alien unlawfully in the United States with a firearm, in violation of 18 U.S.C. 371. When Jany's immigration true status was going to be presented at trial the government's case would have collapse. The government was not going to go to trial with that weak charge. This case would not have taken 5 years to adjudicate if the first original charge was challenge. The government needed more time to develop more serious charges. The government had a major dilemma, defendant's Taos County case was dismissed on August 23, 2018, thus TCSO could no longer detain defendants. The government had two options:

1. They could have allowed the defendants to go free while they continued to build their case.

2. They could have charge defendants with a lesser charge in order to detain defendants while they pursued more serious charges.

They chose the latter, because of their hastiness in pursuing defendants they made serious fatal mistakes. On March 14, 2019, a grand jury issued a superseeding indictment. This is just some of the many perjury committed by the FBI, TCSO, and CYFD in order to further the investigation, that defendant is timely asserting. Again this perjury was discovered from the discovery the government provided to the defendant, no one can claim he made it up.

Jany had a conditional contract with the government as long as she pays the fees for working authorization, the governments gives her permission/consents to her remaining in the U.S. This is what she did continuously from 2007 until April 16, 2018, when her EAD expired. This is contrary to the Government's notion that Jany was here in the U.S. illegally and out of status for 20 years. Jany fulfilled her obligation by continuously renewing her EAD yearly. The U.S. continuously approved her EAD from 2007 until it expired in April 16, 2018.

Defendant could understand a neutral and disinterested judge caution with defendants disposition because of what the government alleges. However when a reasonable neutral judicial officer looks deeper than the surface of this case it is clear that it can not stand up to the scrutiny. When it is clear that all entities in this case the FBI, TCSO and CYFD each recklessly and intentionally committed perjury to further the investigation/ prosecution, they violated defendant's Due Process, at what point does the Court put an end to constitutional violations perpetrated by law enforcement officials.

7

The timeline is very important to when TCSO and FBI first inquired about Jany's immigration status and when they received it. To when the criminal complaint was filed and when her immigration status was presented to the grand jury.

The FBI intentionally, recklessly omitted from the criminal complaint and grand jury indictment that Jany was legally in the country and had deferred status. **SA Adelfa Garcia swore on his affidavit that Jany would be consider unlawfully in the United States when her visa expired, in other words, six months after her entry into the United States B2 Visitor on June 24, 1998. At present, Jany does not have any pending application and no pending deferred action. On June 24, 1998, Jany entered the United States at New York City, NY as a non- immigrant B-2 visitor and was admitted for a period not to exceed six (6) months. After this visa expired, Jany received no subsequent visas or authorization to remain in the United States.** On March 6, 2017 Jany submitted I-765, Application for Employment Authorization. On April 20, 2017,United States Customs and Immigration Services (USCIS) approved the application. On April 16, 2018. Jany's Employment Authorization Document (EAD) expired no new application has been filed. On May 1, 2017 Jany submitted and I-485 application to adjust her status. On June 29, 2018, the USCIS sent Jany a rejection notice. USICS Atlanta confirmed that Jany's I-485 application for permanent residency was denied. Jany abandoned her application by failing to appear to two scheduled interviews. At the present time Jany is without lawful status. (See Exhibit A Doc.1 SA Garcia Criminal Complaint August 31, 2018 )

Compare his falsified sworn affidavit to the actual immigration documents file number 088372419 from Jany's true immigration status. On **August 7, 2018 information on Leveille was received from the Albuquerque FBI office. The Albuquerque FBI office indicated that Leveille was born in Haiti and requested that her immigration status be determine. On August 8, 2017 the Taos Sheriff office contacted ERO to determine alienage of Leveillle.**
Immigration History on June 24, 1998, Leveille's last documented entry the United states was on or near New York City, NY as a B2 visitor. On April 17, 2006 Leveille submits an I-360 petition under the name Jany Louis Jacques. On October 31, 2007 USCIS sent approval notice I-360 petition. On May 1, 2008 Leveille submits I-485 application to adjust status to permanent resident. On May 16, 2008 Leveille submits I-485 application to adjust to permanent resident. On July 28, 2008 USICS sent rejection notice for I-485 application. On December, 2008 USICS sends approval notice for I-130 petition. On May 1, 2017 Leveille submits I-485 application to adjust status to permanent resident.

On April 16, 2018 Leveille's Employment Authorization Document expires. On June 29, 2018 USICS sent rejection notice for I-485 application Office of the Chief Counsel indicated that if Leveille was issued the Employment Authorization Document (EAD), by USICS, under deferred action based on the approved I-360 petition, Leveille may not be amenable removal. Form I-797, notice of action dated October 31, 2007 indicates that Leveille was granted deferred action for a period of 15 months from the date of notice.

The I-797 notice indicates that in **order to extend deferred action** Leveille would either have to submit a request in writing for an extension or have an approval form I-765 for employment authorization. As stated above, Leveille's Employment Authorization Document expired on April 16, 2018 and there is no record found that Leveiile has filed form I-765 to request an extension of employment authorization or submitted a written request. **Based on this information Leveille no longer has deferred action as her I-485 was denied and her EAD expired in April 2018 a long with no record of requesting an extension.** With OCC concurrence Jany Leveille will be placed into immigration proceeding. ( See Exhibit B BN 261, 262)

This document clearly shows that not only SA Garcia knew Jany Leveille had **subsequent visas or authorization to remain in the United States.** She was legally in the U.S. and had EAD authorization approval from October 31, 2007 and she renewed it continuously each year until it expired on April 16, 2018. Her deferred status was adjusted. TSCO and FBI both knew Jany's true status. SA Garcia intentionally, recklessly omitted Jany's true status in order to manufacture criminal charges. SA Garcia intentionally, recklessly left out every application Jany filed and was approved from 1998 to 2017. SA Garcia swore to the veracity of the complaint which he intentionally, recklessly committed perjury.

Amazingly enough SA Taylor knew SA Garcia's Criminal Complaint was false. On Ms. Converse cross examination of SA Taylor: Q. Agent Taylor, towards the end of your testimony, answering Mr. Kraehe's questions, you said that my client was- had entered the country on a visitor visa and had been out of status for 20 years? A. I believe I said that she's been out of status for 20 years. Q. She entered as a 15-year – old with her mother, didn't she? A. To the best of my recollection, that's what I know (Indiscernible) Q. And that was in 1998? A. I don't know the exact date. Q. You wrote that date in your- A. It was approximately 20 years ago. Q. Okay. A. And I believe that that is the date, but I don't recall from that time period.

Q. And nine years after that, in 2007, she applied for and received protection under the Violence Against Women Act, which is a temporary immigration status, didn't she? A. I do not know-- I don't recall that exact fact. Q. You knew that she received it at some point, if not in 2007? A. I know she received-- or applied for several visas during her time here, but I do not recall exactly what for. Q. And she got – your Complaint Affidavit mentioned one time when she applied for a renewal of employment authorization, but there were actually many times when she renewed that, didn't she?

A. Are you talking about the arrest Complaint? Q. Yes the Criminal Complaint, document 1 in this case. A. I did not swear to that Complaint. Q. Okay. Were you consulted on it? A. To a degree, yes. Q. Do you believe-- is any of the information in there inaccurate? A. Not to my knowledge, no. Q. Are you aware that she applied for renewals of her employment authorization from the Immigration Service repeatedly? A. From the best of – to the best of my knowledge, yes. Q. And one of those times was March 3rd of 2017. Is that right? A. I do not know the exact date. Q. Okay. If that's the date in the Complaint, would you dispute that? A. No. Q. And if the Complaint said that that was approved by Immigration Services on April 20th of 2017, you wouldn't dispute that date, would you? A. I would not dispute that date. Q. And a little after that, she files another Application for adjustment of status. Isn't that right? A. I believe that's correct. Q. That would be May 1st , according to the Compliant? A. I would not dispute that. Q. And adjustment of status is changing from a non- immigration status to a permanent resident status. Is that right? A. To the best of my knowledge, but I'm not an immigration official. I don't know exactly how it works. Q. And on April 16th of this year, her last employment authorization expired. Is that true? A. To the best of my knowledge. Q. And then after two months after that, her adjustment of status was denied because she failed to appear for a hearing. Is that right? A. To the best of my knowledge. Q. Do you know where the notices of that hearing were sent? A. I do not. Q. Do you know whether they were sent to New Mexico? A. I do not. Q. Or Alabama? A. I do not. Q. So you don't have any knowledge whether she ever received it? A. Not to my knowledge. ( Detention hearing in Albuquerque September 2018 Pages 84-87 )

SA Taylor is the case agent in this case. He knew the Criminal Complaint was false that is why he did not swear to it. He was consulted for this case, he knew Jany applied for and was approved for multiple EAD from October 2007 to April 16, 2018. It was the FBI Albuquerque office who sought Jany's Immigration status in August 7, 2018 and received her status on August 14, 2018. He testified that Jany was out of status for 20 years that was a blatant lie. Mr. krasgree on direct examination of SA Taylor: Q. And do you have any knowledge regarding her immigration status? A. Per Immigration Enforcement agency, she's been out of status for approximately 20 years. Q. And to your knowledge is she unlawfully and illegally in the United States? A. Yes sir. (Detention hearing in Albuquerque September 2018 Page 55 lines 10-16 )

The perjury committed by these law enforcement officials has no bounds. He knew the facts of the Complaint was false and inaccurate underscores the misconduct. SA Taylor is responsible for the conspiracy to violate Wahhaj's constitutional rights. He purposely misled the veracity of the facts in the indictment that is why he did not swear to it. Important point to focus on SA Taylor stated he did not swear to SA Garcia's report. He makes that statement as though that alleviates his responsibility to verify information before it goes to the grand jury. There is only one FBI, SA Taylor's concerns was not the rights of the defendants, it was to pursue an investigation no matter if it was illegal or not. After two decades of expensive surveillance/investigations, which did not turn out any charges, the FBI finally had their chance which they were not going to lose even if it meant violating defendants constitutional rights.

The prosecutor committed abuse of the grand jury by deliberately withholding from the grand jury material and exculpatory evidence of which they had knowledge thereby creating false impression of the evidence to the grand jury. In violation to this commitment, and without any proper justification. The government placed before the Grand Jury a barred from prosecution by the commitment. This mass of information also improperly prejudice the Grand Jury and so vitiated its independence that Mr Wahhaj has been denied his right to be free from indictment except by an impartial finding of probable cause as guaranteed by the Fourth and Fifth Amendment's to the Constitution. The prosecutor presented perjured information before the Grand jury that SA Taylor prepared. The Grand jury returned an indictment. Magistrate Judge Khalsa used the Grand jury findings of probable cause to detain Wahhaj and Co- defendants pending trial denying them Due Process. Mr Wahhaj and Co- defendants have been in pretrial detention for almost 5 years. ( Detention hearing in Albuquerque September 2018 Pages 160,161 lines 21-25, lines 1-4  )

The total conduct of the United States officials, SA Taylor, SA Garcia  acting as agents of the United States officials or independently as they relate to the defendant are such a nature as to both shocking and offense to American notions of justice. Continued judicial proceedings in this cause will make the court a party to such illicit and immoral conduct and will cause it to become negligent in its duty to supervise the administration of justice in federal criminal cases brought before it. Mr. Wahhaj suffered great prejudice as a result of the government's action. The government used the Grand jury principally to prepare pending charges for trial. The United States used the Grand jury solely to bolster its case.

In order to dismiss an indictment based on constitutional offensive proprietorial misconduct, " Such as misleading or misinforming the grand jury," the court must either find that the "defendant suffers prejudice as a result of the government's actions,"  United States v. Piedrahita, 791 F. Supp. 418, 420 ( S.D. N.Y. 1992), Citing bank of Novia Scotia v. United States v. Brio, 907 F.2d 392, 394 (2d Cir. 1990), or " a history of proprietorial misconduct that is so systematic and pervasive and that it affects the fundamental fairness of the proceedings or if the independence grand jury is substantially infringed," Red Elk, 955 F. Supp. At 1174, citing Bank of Novia Scotia, 487 U.S. at 259, 108 S.ct. At 2375-76, Isgro, 974 F.2d at 1094. Prejudice may be presumed from constitutional error " where the structural protection of the grand jury have been so compromised as to render the proceedings fundamentally unfair...." Bank of Novia Scotia,  487 U.S. at 257, 108 S.ct. At 2374-75, Citing Rose v. Clark, 478 U.S. 570, 577-78, 106 S.ct. 3101, 3105-06 ( 1986).

Stated another way, a defendant is prejudiced when " it is established that the violation substantially influenced the grand jury decisions to indict was free from substantial influence of such indictments. Bank of Novia Scotia,  487 U.S. at 256, 108 S.Ct. At 2374, quoting United States v. Mechanik, 475 U. S. 66, 78, 106 S.Ct.938, 946 ( 1986). See also  United States v. Breslin, 916 f. Supp. 438, 441 L.e.d. P.A 9 1996)

TCSO seized defendants children on August 3, 2018, placed them on a 48 hour hold, filed criminal child abuse charges on August 5, 2018, and dismissed on August 23, 2018. CYFD filed civil child abuse charges on August 7, 2018 4 days after TCSO seized defendant's children in violation of NMRA 10-312 B, in order to gain information to further the investigation.

Sheriff Jerry Hogfre executed an illegal search warrant, manufactured false charges of child abuse, seized defendant's children, placed them with CYFD in order to conduct safe room interviews to further the investigation. CYFD allowing the FBI to interrogate, coerce defendant's minor children without reading them their Miranda rights, nor having an attorney present, without their parents' consent and knowledge.

All eleven children were taken in protective custody by Affiant and later turned over to CYFD case worker Tony. The three females were taken to CAV and not initially criminally charge it was Affiant's ("Sheriff Jerry Hogfre ") belief that **prolonging charges** may benefit of CYFD to gather facts about the children and to further the investigation. It should be noted that the women have since been re-interviewed by investigator and FBI agents and none have stated they were held at this compound against their will nor have they given any additional information as to the whereabouts of AG Wahhaj. ( See BN 2492 Affidavit for second search warrant)

The prolonging of charges, the using grand jury as a fishing expedition is consistent with willing collaborators to violate defendant's constitutional rights. Using the initial grand jury to later supersede defendants with additional more serious charges. It was defendant's stepsons who at the time were 16 & 13 respectively who testified at the Grand Jury under the supervision of the FBI.

## Perjury general

Whoever

(1) having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorize an oath to be administered, that he will testify, declare, depose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true; or

(2) in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, United States Code, willfully subscribes as true any material matter which he does not believe to be true; is guilty of perjury and shall, except as otherwise expressly provided by law, be fined under this title or imprisoned not more than five years, or both. This section is applicable whether the statement or subscription is made within or without the United States.

## False declaration before grand jury or court

(a) Whoever under oath (or in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, United States Code) in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration or makes or uses any other information, including any book, paper, document, record, recording, or other material, knowing the same to contain any false material declaration, shall be fined under this title or imprisoned not more than five years, or both.

(b) This section is applicable whether the conduct occurred within or without the United States.

(c) An indictment or information for violation of this section alleging that, in any proceeding before or ancillary to any court or grand jury of the United States, the defendant under oath has knowingly made two or more declarations, which are inconsistent to the degree that one of them is necessarily false, need not specify which declaration is false if
(1) each declaration was material to the point in question, and

(2) each declaration was made within the period of the statute of limitations for the offense charged under this section.

In any prosecution under section, the falsity of declaration set forth in the indictment or information shall be established sufficient for conviction by proof that the defendant while under oath made irreconcilably contradictory declaration material to the point in question in any proceeding before or ancillary to any court or grand jury. It shall be a defense to an indictment or information made pursuant the first sentence of this subsection that the defendant at the time he made each declaration believe the declaration was true.

(d) Where, in the same continuous court or grand jury proceeding in which a declaration is made, the person making the declaration admits such declaration to be false, such admission shall bar prosecution under this section if, at time the admission is made, manifest that such falsity has been or will be exposed.

(e) Proof beyond a reasonable doubt under this section is sufficient for conviction. It shall not be necessary that such proof be made by any particular number of witnesses or by documentary or other type of evidence

Are law enforcement officials allowed to continuously lie on sworn affidavits to pursue a prosecution without repercussions, or is committing perjury a violation for citizens only. Will TCSO, FBI and CYFD be prosecuted for intentionally, recklessly committing perjury, lose their jobs and held accountable.

# **CONCLUSION**

TCSO was engaging in a fishing expedition, it was their hope by isolating the defendant's children from their parents under the guise of CYFD conducting safe room interviews in order to further the investigation. The normal legitimate legal ways surveillance, intelligence gathering techniques, did not turn up any fruits so they had to resort to illegal tactics.

Sheriff Jerry Hogfre prolonged the charges in order to allow CYFD to conduct safe room interviews in order to further the investigation. CYFD a willing collaborator understood their part, so they prolonged the filing of petition by 4 days in violation of NMRA 10-312 B. **Time limits** If a child is taken into custody, a petition alleging abuse or neglect shall be filed by the department within two (2) days from the date that the child is taken into emergency custody by the department. If a petition is not filed within the time set forth in this paragraph, the child shall be released to the child's parents guardian or custodian.

From the safe room interviews/ interrogation of defendants minor children by the FBI, federal criminal charges were manufactured. The manufactured charges were presented to the grand jury. The grand jury found probable cause to indict defendants. As a result magistrate judge Khalas detained defendants, they have been in continuous detention for almost 5 years, which caused them irreparable harm. SA Garcia understood his role that is why he intentionally, recklessly omitted Jany's true immigration status in order to manufacture criminal charges. SA Taylor understood his role that is why he did not swear to the criminal complaint.

On August 3, 2018, the FBI, TCSO, and CYFD, did knowingly conspire, combine, confederate and agree with each other and act interdependently with one another to knowingly violate defendants constitutional rights.
These are willing collaborators'/conspirators' with one goal in mind, to further the investigation by any means necessary illegal or not. Willing collaborators'/conspirators', FBI, TCSO, and CYFD should have been charged with conspiracy not defendants. It was not defendants who prolonged the charges in order to further the investigation, it was not the defendants who intentionally and recklessly waited 4 days to file a petition of abuse or neglect, it was not the defendants who intentionally, recklessly omitted Jany's true immigration status in order to manufacture criminal charges. It was not the defendants who did not swear to the criminal complaint. Individuals mock at defendants when they assert with undeniable proof that the FBI, TCSO, and CYFD conspired to deny defendants their constitutional rights to due process.

This proof was discovered from the government's own discovery that they provided to defendants. So their mockery is a mockery at their own selves.

Defendant have shown evidence of a substantial likelihood of gross or prejudicial irregularities in the conduct of the Grand jury. He have met the heavy burden that Grand Jury abuse occurred. Disclosure of the Grand Jury transcripts would corroborate the Defendants' arguments.

1.  SA Garcia included false statements and material omissions hidden to Grand jury to create the impression of probable cause.

2.  SA Garcia filed the Criminal complaint Doc. 1 on August 31, 2018, SA Taylor is the case agent and did not swear to the criminal complaint. SA Taylor had ample time to check the veracity of the Complaint, which he failed to do so. The Woods File was established in 2001, 17 years after SA Garcia filed his criminal complaint. FBI policy requires the case agent who will be requesting the FISA applications to create and maintain an accuracy sub- file (known as a Woods File") that contains; (1) supporting documentation for every factual assertion contained in a FISA applications, and 2) supporting documentation and the results of required database searches and the other verification.

3.  SA Taylor had Knowledge of the complaint. As the case agent he knew or should have known that he must verify every factual assertion.

4.  SA Taylor was consulted for it.

5.  The FBI's Albuquerque office inquired about Jany's true immigration status on August 7, 2018, and received it on August 14, 2018.The Criminal Complaint was filed on August 31, 2018.

6.  SA Taylor admitted that Jany," I know she received-- or applied for several visas during her time here, but I do not recall exactly what for." He stated he does not know how immigration works. He had a duty if he did not know how immigration works to verify SA Garcia's criminal complaint, before that perjured information went to grand jury proceedings. This caused defendants irreparable harm. ( Detention hearing in Albuquerque September 2018 Pages 84-87 )

7.  The government could not claim that the they gained incidental benefit from the Grand Jury. The methodology of preparing the perjured information for the grand jury was intentional and deliberate.

8. This was for the sole or dominant purpose to bolster the government's case, to conduct a fishing expedition in the hopes of discovering useful material. Which they did, the first indictment was the precedent for the superseding indictment, which led to the indefinite detention of defendants for almost 5 years. If that does not show prejudice then prejudice has two different meanings when it comes to Muslims.

The immigration document clearly shows that Jany's immigration status had changed since she entered the U.S. at 15 years- old with her mother in 1998. This does not reflect SA Garcia's criminal complaint and what defendant will be able to show on the grand jury transcripts provided he is allowed to have them. Justice demands that this is one of those situations where the disclosure of Grand Jury minutes is appropriate, which defendant timely asserts. The totality of circumstances makes it abundantly clear that Mr Wahhaj was denied the right to be free from indictment except by an impartial finding of probable cause as guaranteed by the Fourth and Fifth Amendment's to the Constitution. Defendant is requesting for production of the Grand Jury transcripts in order to challenge the propriety of the Grand Jury proceedings. Defendant has shown a particularized need for the documents that outweighs the public policy of Grand jury secrecy.

**Therefore,** for the foregoing reasons defendant is respectfully requesting the production of Grand Jury transcripts.

Respectfully Submitted,

by, *Siraj Wahhaj*

Siraj Wahhaj
414151

# EXHIBIT  A

AO 91 (Rev. 11/11)  Criminal Complaint

**FILED**
At Albuquerque NM
AUG 3 1 2018

# UNITED STATES DISTRICT COURT
### for the
### District of New Mexico

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| JANY LEVEILLE, SIRAJ IBN WAHHAJ, HUJRAH WAHHAJ, SUBHANAH WAHHAJ, and LUCAS MORTON | ) ) ) ) ) | Case No.  18-MJ-2835 |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ 11/2017 to in or about 08/2018 _____ in the county of _____ Santa Fe _____ in the _____ State and _____ District of _____ New Mexico _____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Violation of 18 U.S.C. $ 371, and | Conspiracy |
| 18 U.S.C. $ 922(g)(5), and $ 2 | Illegal Alien in Possession of a Firearm and Ammunition, Aiding and Abetting. |

This criminal complaint is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Adelfa Garcia, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _August 31, 2018_

_____
*Judge's signature*

City and state: _____ Albuquerque, NM _____

Jerry H. Ritter, US Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CRIMINAL NO. _____ |
| | ) | |
| vs. | ) | |
| | ) | |
| **JANY LEVEILLE, SIRAJ IBN** | ) | |
| **WAHHAJ, HUJRAH WAHHAJ,** | ) | |
| **SUBHANAH WAHHAJ, and** | ) | |
| **LUCAS MORTON,** | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, ADELFA GARCIA, being duly sworn, depose and say as follows:

1.      I am a Special Agent of the Federal Bureau of Investigation (FBI) currently

assigned to the Albuquerque Division, to investigate violations of Federal Law, including

offenses involving firearms in violation of Title 18 of the United States Code.  I have more than

7 years of federal law enforcement experience.

2.      The information set forth in this affidavit has been derived from my own

investigation or communicated to me by other sworn law enforcement officers or from other

reliable sources.  This information is submitted for the limited purpose of establishing probable

cause to believe that JANY LEVEILLE, SIRAJ IBN WAHHAJ, HUJRAH WAHHAJ,

SUBHANAH WAHHAJ, and LUCAS MORTON have committed a felony in violation of Title

18, United States Code, Sections 922(g)(5) and 2 and that JANY LEVEILLE, SIRAJ IBN

WAHHAJ, HUJRAH WAHHAJ, SUBHANAH WAHHAJ, and LUCAS MORTON have

violated Title 18, United States Code, Section 371.  This affidavit therefore does not set forth all of my knowledge about this matter.

3.     JOHN DOE 1 was the biological child of SIRAJ IBN WAHHAJ (IBN) and his wife by lawful marriage, JANE DOE.  According to a statement JANE DOE provided to the FBI on December 14, 2017, Jane Doe and IBN were married in 2004 in Morocco.

4.     JOHN DOE 1 was born with Hypoxic Ischemic Encephalopathy (HIE).  As a result of this condition, JOHN DOE 1 was developmentally delayed, and he walked with a limp and had frequent seizures.

5.     According to open source reporting, IBN previously performed security work in Brooklyn, New York.

6.     IBN has two sisters, SUBHANA and HUJRAH.  HUJRAH has one child. SUBHANAH has four children and is married to LUCAS MORTON (MORTON).

7.     IBN is involved in a relationship with JANY LEVEILLE (JANY).  JANY is a citizen of Haiti residing in the United States without a current immigration status.  According to the U.S. Immigration and Customs Enforcement, Department of Homeland Security, JANY is an alien and has been living in the United States unlawfully since in or about December 1998. JANY has six children, including JOHN DOE 2 and JOHN DOE 3.

8.     JAMELLA AMAULAH JIHAD (JAMELLA) (born 1962) is married to IBN's father.  According to information JAMELLA provided to the FBI in December 2017, IBN and others in the family knew JANY wanted to marry IBN so that JANY could have status to remain in the United States.

9.     According to a witness statement, JANY became pregnant at the same time that JANE DOE became pregnant with JOHN DOE 1.  JANY's pregnancy soon failed.  In or about

2

December 2017, in Georgia, JANY formed the belief that JANE DOE became pregnant only by engaging in "black magic" that resulted in JANY's baby being transferred from JANY into JANE DOE's womb. JANY understood JANE DOE to be barren and thus claimed that JOHN DOE 1 was her child.

10.     According to a statement by JOHN DOE 3, JANY believed she received messages and directions from God. According to JOHN DOE 3, JANY recorded these messages, including in journals that she kept with her. The FBI, Santa Fe RA, has reviewed these journals and they corroborate many of the statements made by JOHN DOE 2 and JOHN DOE 3 in their interviews with the FBI.

11.     According to a witness statement, in or about November and December 2017, before JANY and the others left Georgia for New Mexico, JANY directed IBN to take JOHN DOE 1 and bring him to her. According to JOHN DOE 3, it was at or about this time that, "We was (sic) ordered [to leave Georgia and] to go to New Mexico."

12.     According to witness JOHN DOE 3, JANY together with her children and IBN took JOHN DOE 1 in her vehicle and drove from Georgia to New Mexico in December 2017. According to JOHN DOE 3, JANY explained that she wanted to take JOHN DOE 1 to New Mexico to perform an exorcism on him, to cast the demons from his body, after which he would come to life as Isa (an Islamic term for Jesus Christ). JANY explained that Isa would then instruct JOHN DOE 3 and the others on what corrupt institutions they needed to get rid of. JOHN DOE 3 explained that those institutions were teachers, military, law enforcement, and financial institutions. JOHN DOE 2 and JOHN DOE 3 stated that "get rid of" meant that those who did not believe as they did would be killed or imprisoned.

13.     According to information provided to the FBI by an Alabama State Trooper, on December 13, 2017, while en route to New Mexico, IBN crashed a silver 2004 Ford Explorer bearing Georgia license plate RGE8599 in Alabama.  The vehicle was registered to JANY.  At the time of the accident, there were five firearms, a bullet-proof vest, and a bag of ammunition in the vehicle.  MORTON arrived in a large box truck and helped IBN remove the firearms from the vehicle.  IBN told the Alabama State Trooper that he was traveling from Georgia to New Mexico to go camping.  There were nine people in the vehicle at the time of the accident: two adults and seven juveniles.  JOHN DOE 3 stated in an interview that he, IBN, JANY, and JOHN DOE 1 were in the vehicle at the time of the crash.  IBN stated that the vehicle involved in the crash was owned by JANY.  JANY told the Alabama State Trooper that they were traveling from Georgia to New Mexico to see land owned by IBN's brother-in-law.

14.     Sometime in December 2017, the Clayton County Police Department obtained a letter IBN wrote to his brother.  The letter states, in part:

. . . Allah says He will protect you always, so follow, until He makes you

a martyr as you wanted and the only way is by joining the righteous [us].

You will meet Isa also here in about 4 months in sha Allah.  So hurry, do

NOT drag your feet, leave whatever we told you to leave and follow what

brother Luqman is telling you.  Take all your money out the bank and

bring your guns . . . .

15.     MICHAEL LOUIS-JACQUES (MICHAEL) (born 1978) resides in Brooklyn, New York.  As reported by MICHAEL to the FBI, a letter from JAMELLA sent to MICHAEL in January 2018 stated that IBN called himself the messenger.  According to this letter as reported

to the FBI, JANY believed the Messiah and Antichrist are coming in four months. The letter also allegedly stated that JANY was trying to recruit individuals to their group.

16.      On January 9, 2018, an Adult Warrant was issued by the Juvenile Court of Clayton County, Georgia in Case No. 053118-00-01, that stated IBN absconded with JOHN DOE 1 on or about December 1, 2017, and the whereabouts of the child were unknown. The warrant further stated that JANE DOE stated that JOHN DOE 1 had medical conditions and required constant attention and that IBN made it known before absconding that he wanted to perform an exorcism on JOHN DOE 1 because he believed JOHN DOE 1 was possessed by the devil. The warrant also directed any and all law enforcement to take IBN into custody and place him in the common jail of Clayton County, Georgia.

17.      Based on multiple sources, from in or about December 2017 until August 3, 2018, JANY, IBN, MORTON, SUBHANAH, HUJRAH, JOHN DOE 2, JOHN DOE 3, and nine other children lived on a property that was situated off 55 Panorama Boulevard, Amalia, New Mexico (the "Compound"). A wooden frame was built around the hole and plastic tarps were placed on top to provide shelter. The home was surrounded by a tire wall. Within the Compound was a 100 foot tunnel dug into the ground which was used for storage of various items to include firearms, notebooks, and perishables. To the rear of the Compound was a homemade firing range with targets which was backed by a tire wall filled with sand. On the main entry to the Compound a storage shed was built. In an interview with the FBI, JOHN DOE 3 stated that JANY was the head of the household.

18.      According to a statement by JOHN DOE 3, IBN was well trained in firearms and military tactics and instructed JOHN DOE 2 and JOHN DOE 3 and others in firearms and

military tactics, including tactical reloads, disarmament techniques, clearing buildings, rapid

reloads, and hand-to-hand combat.

19.     According to a statement by JOHN DOE 3 to the FBI, JANY ordered IBN to

recite scripture over JOHN DOE 1, and IBN did so on a regular basis.  JANY explained that the

purpose of these prayers was to cast the demons from JOHN DOE 1's body.  During the course

of this ritual, JOHN DOE 1 would sometimes froth at the mouth and choke.  JOHN DOE 3

personally witnessed IBN engage in the ritual in which JOHN DOE 1's heart stopped.  JOHN

DOE 2 stated that JOHN DOE 1 died in or about February 2018.  According to JANY's journals,

JOHN DOE 1 died on or about December 24, 2017, under circumstances similar to those

described by JOHN DOE 3 in his interview.

20.     According to a statement by JOHN DOE 2, JOHN DOE 2 was told by JANY and

others at the Compound not to talk to anyone about JOHN DOE 1 ever being at the Compound

because they would "all go to jail."

21.     According to JOHN DOE 2, IBN wanted to get an army together and train them

to conduct what he called "jihad."  JOHN DOE 2 explained that jihad meant to kill people for

Allah.  Both JOHN DOE 2 and IBN were training in arms and weapons at the Compound. When

JOHN DOE 1 eventually came back as Isa, JANY's instructions were that JANY, JOHN DOE 2

and IBN would go to visit corrupt institutions or individuals to talk to them. If JANY interpreted

any of them as non-believers, IBN and JOHN DOE 2 would be instructed to kill them. During

their training, JOHN DOE 2 saw JANY train with a gun once and fire it at the Compound.

22.     On August 3, 2018, law enforcement from the Taos County Sheriff's Office

(TCSO) executed warrants on the Compound.  According to a statement by JOHN DOE 2 to the

FBI, IBN, MORTON, and JOHN DOE 2 armed themselves and were ready to defend the

6

Compound. Before any shots were fired, JANY instructed IBN and the others to surrender. Per a statement by JOHN DOE 2, he [JOHN DOE 2] never intended to shoot anyone.

23.    JANY would be considered unlawfully in the United States when her visa expired, in other words, six months after her entry into the United States as a B2 Visitor on June 24, 1998. At present, JANY does not have any pending applications and no pending deferred action.

24.    On June 24, 1998, JANY entered the United States at New York City, NY as a non-immigrant B-2 visitor and was admitted for a period not to exceed six (6) months. After this B-2 visa expired, JANY received no subsequent visas or authorization to remain in the United States.

25.    On March 6, 2017, JANY submitted an I-765, Application for Employment Authorization. On April 20, 2017, United States Customs and Immigration Service (USCIS) approved the application.

26.    On April 16, 2018, JANY's Employment Authorization Document (EAD) expired. No new application has been filed.

27.    On May 1, 2017, JANY submitted an I-485 application to adjust her status. On June 29, 2018, the USCIS sent JANY a rejection notice.

28.    USCIS Atlanta confirmed that JANY's I-485 application for permanent residency was denied. JANY abandoned her application by failing to appear to two scheduled interviews. At the present time JANY is without lawful status.

29.    The following firearms were recovered from the Amalia compound:

(a)    A Marlin 336R 30-30 caliber rifle having serial number R2898. There was no purchaser information for this firearm.

(b) A Glock 17Gen4 9 mm pistol having serial number BDLC017 and purchased by IBN.

(c) A Glock 26Gen4 9 mm pistol having serial number BEUV018 and purchased by HUJRAH.

(d) A Kimber Pro Aegis II 9 mm pistol having serial number KRF7874 and purchased by IBN.

(e) A Ruger SP101 .357 caliber revolver having serial number 575-55758 and purchased by IBN.

(f) A Sanayi CZ 612 HC-P 12 gauge shotgun having serial number 1166A12 and purchased by IBN.

(g) A Smith & Wesson 642 .38 caliber revolver having serial number CVB3274 purchased by IBN.

(h) A HS Products XD40 .40 caliber pistol having serial number US411172 and purchased by IBN.

(i) A Glock 42 .380 caliber pistol having serial number ABDB288 and purchased by IBN.

(j) A Savage 10 .308 caliber rifle having serial number H602915 and purchased by IBN.

(k) A Bushmaster XM15-E2s .223 caliber rifle having serial number BFI659484 and purchased by IBN.

Each of these firearms meets the federal definition of firearm under 18 U.S.C. § 921(a)(3), and each travelled in interstate commerce.

30.     Also recovered from the compound was a large quantity of ammunition, a number of high-capacity magazines, a bullet-proof vest, and other firearms accoutrement.

31.     Based on available information, all but one of the firearms were purchased in

Georgia and one was purchased from a Connecticut dealer.  Evidence suggests the firearms were

transported from Georgia to New Mexico.  As noted above, at least five of these firearms were

transported in JANY's Ford Explorer in Alabama.  The firearms were then transported in the

back of a box truck, in which the children and others traveled, from Alabama to New Mexico.

After the group's arrival in New Mexico, the firearms were kept in a number of locations,

including under JANY's bed and in one of the Compound's tunnels, and were kept unsecured

and readily accessible by all persons residing in the Compound.

32.     Based on the information set forth in this affidavit, I submit that there is probable

cause to believe:

(a)  that at least from in or about November 2017 and continuing thereafter until at least

in or about August 2018 in the District of New Mexico and elsewhere, JANY

LEVEILLE, SIRAJ IBN WAHHAJ, HUJRAH WAHHAJ, SUBHANAH WAHHAJ, and

LUCAS MORTON, defendants herein, did knowingly conspire, combine, confederate

and agree with each other and act interdependently with one another to knowingly

provide JANY LEVEILLE, defendant herein, an alien who was illegally and unlawfully

in the United States, possession of firearms and ammunition, in violation of 18 U.S.C. §§

922(g)(5) and 2, and that in furtherance of the conspiracy, and to effect the objects

thereof, JANY LEVEILLE, SIRAJ IBN WAHHAJ, HUJRAH WAHHAJ, SUBHANAH

WAHHAJ, and LUCAS MORTON, defendants herein, committed overt acts, as stated

herein, within the District of New Mexico and elsewhere, in violation of 18 U.S.C. § 371.

(b)     that on or between December 2017 and August 2018, in Taos County, in the

District of New Mexico, the defendant, JANY LEVEILLE, being an alien illegally and

unlawfully in the United States, knowingly possessed, in and affecting commerce,

firearms and ammunition and that SIRAJ IBN WAHHAJ, HUJRAH WAHHAJ,

SUBHANAH WAHHAJ, and LUCAS MORTON, did aid and abet her possession, in and

affecting interstate commerce, of firearms and ammunition,

In violation of 18 U.S.C. §§ 922(g)(5) and 2.

I swear that this information is true to the best of my knowledge and belief.

Respectfully submitted,

ADELFA GARCIA
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me this 31st day of August 2018.

JERRY H. RITTER
United States Magistrate Judge

# EXHIBIT B

U.S. Dcpart111 c111 of l-l orncla ncl Scc11 ri1y
Ahen·s Name
LEVEILLE , JANY
File Number
0 88 372 419
. I-213
Continuation Page for Form _ _ _
Date
08/14/2018
Event No: ABQ1808000014
08/14/2018 - 237a1B - NONIMMIGRANT OVERSTAY
Previous Criminal History
No Crimes selected f or inclusion on the I-213 .
Records Checked
NCIC Neg
ATS-P Pos
CIS Pos
CLAIM Pos
At/Near
Albuquerque, New Mexico
Record of Deportable/ Excludable Alien :
ENTRY DATA:
LEVEILLE, Jany admits to being a citizen and national of Haiti by birth on March 6, 1983 in
Port-Au-Prince, Haiti. LEVEILLE last entered the United States legally on or about June 24 ,
1998 at or near New York City, New York as a B2 Visitor after being inspected by an
Immigration Official.
ARREST DATA:
On August 7, 2018 information on LEVEILLE was received from the Albuquerque FBI Office. The
Albuquerque FBI Office indicated that LEVEILLE was born in Haiti and requested that her
immigration status be determined.
On August 8, 2017, the TAOS Sheriff 's Office contacted Albuquerque ERO to determine alienage
of LEVEILLE.

An investigation was conducted and it was determined that LEVEILLE was amendable to removal
proceedings as a non-immigrant overstay .
Record checks revealed that LEVEILLE had an I-485 application denied on June 29, 2018 and
that her EAD card expired on April 16, 2018. No record was found that indicated that LEVEILLE had applied to renew her EAD card.
USCIS/FDNS Atlanta, GA confirmed that LEVEILLE's I-485, application for permanent residency
was denied. LEVEILLE abandoned her application by failing to appear to two scheduled interviews. LEVEILLE does have an approved I -130 and I-360 and based on those she could reapply for permanent residency but as of right now there is nothing in the file that would
immediately grant her any lawful status . USCIS/FDNS Atlanta Ga indicate that LEVEILLE was granted deferred action based on the approved I-360 petition but that it was granted for a period of fifteen months from the date of approval, October 31 , 2007. USCIS/FDNS Atlanta, GA
provide copy of denied I-485 and petition indication deferred action was only granted for fifteen months from October 31, 2007.
J 4294 WASSON
l Title
DO
/1
_ _2 _ of _4_ _ **Pages**
l

**US v. Leveille et al 261**

U.S. Departmen t of Homeland Security
Alien' Name
LEVEILLE, J ANY
File Number
088 372 419
Conti. nu:iti. on p:ige f or Form _I - _21_3 ___
Date
08/14/2018
Event No: ABQ180 8000014

Office of t he Chief Counsel indicated that if LEVEILLE was issued the Employment
Authorization Document (EAD), by USCIS, under deferred action based on the approved I-360
petition, LEVEILLE may not be amendable to removal proceedings. But if not, LEVEILLE would
be amendable to removal . Form I - 797, notice of action dated October 31 , 2007 indicates that
LEVEILLE was granted deferred action for a period of 15 months from the date of the notice.
The I-797 notice of action indicates that in order to extend deferred action LEVEILLE would
either have to s ubmi t a request in writing for an extension or have an approved form I-765
for employment authorization. As stated above, LEVEILLE ' $ Employment Authorization Document
expired on April 16, 2018 and there is no record found that LEVEILLE has filed form I-765 to
request an extension of employment authorization or submitted a written request. Based on
this information LEVEILLE no longer has deferred action as her I - 485 was denied and her EAD
expired in April 2018 a long with no record of requesting an extension. With OCC concurrence Jany LEVEILLE will be placed into immigration proceedings.
On August 14, 2018 LEVEILLE , Taos County Detention Center honored t he I-247 detainer due to
the potential media interest in the case and Jany LEVEILLE was released ICE/ERO custody from
the Taos County Detention Center located in Taos , New Mexico . Deportation Officer J. Wasson
identified himself as a Deportation Officer with Immigration and Customs Enforcement. Upon
questioning, LEVEILLE was identified by biographical data , photo and her own admission.
LEVEILLE was transported to the Immigration and Customs Enforcement Office in Albuquerque,
NM for processing without incident.
RECORDS CHECKS:
A routine query of the ENFORCE/IDENT/IAFIS system, Criminal, and Immigration history checks

revealed the following:

IMMIGRATION HISTORY: 088 372 419

On June 24 , 1998, LEVEILLE' s last documented entry into the United States was at or near New

York City, NY as a B2 Visitor .

On April 17, 2006 LEVEILLE submits an I-130 petition under the name Jany Louis Jacques.

On May 5, 2007 LEVEILLE submits an I-360 petition under the name Jany Louis Jacques.

On October 31, 2007 USCIS sent approval notice for I-360 petition .

On May 1, 2008 LEVEILLE submits I - 485 appl ication to adjust status to permanent resident.

On May 16, 2008 USCIS sent rejection notice for I-485 application.

On July 21, 2008 LEVEILLE submits I-485 application to adjust status to permanent resident.

On July 28, 2008 users sent rejection notice for I-485 application.

On December 23, 2008 users sends approval notice for I-130 petition .

On May 1, 2017 LEVEILLE submits I - 485 application to adjust status to permanent resident.

On April 16, 2018 LEVEILLE 's Employment Authorization Document expires .

On June 29, 2018 users sent rejection notice for I-485 application .

CRIMINAL HISTORY: No FBI Number

On August 8, 2018 LEVEILLE was charged in the Eighth Judicial District Court , County of

Taos, State of New Mexico with 11 counts o= Child Abuse contrary to Section 30-6-l(D) , NMSA

1978, a third- degree felony. Criminal Case is pending.

According to court documents the Taos Sheriff's Department found LEVEILLE in control of a

property , upon which eleven children resided . Trip hazards , wood with nails sticking up,

J 4294 WASSON

l Title

DO

f ___ 3 _ of ___ 4 __

Form 1-831 Contm11a11on Page (R.:v O>t0 1,07)

**US v. Leveille et al 262**

DISTRICT OF NEW MEXICO
Office of the Clerk
Suite 270
333 Lomas BLVD, N. W.
ALBUQUERQUE, NEW MEXICO 87102

Siraj Ibn Wahhaj,                                              6/2/23
Federal detainee N0. 00414151
Cibola County Correctional Center
P.O. Box 3540
Milan, NM 87021

Greetings Clerk of Court Mitchell R. Elfers,

    My case N0: 18-CR-02945-WJ, I am respectfully
requesting the following:

1) A Stamp copy of this Motion to produce Grand
Jury transcripts.

2) The transcripts from 5/26/23 Faretta Hearing
Thank You!

                                              Respectfully
                                              by: Siraj Wahhaj
                                              N0. 00414181

Siraj Wahhaj
Federal Detainee No. 00441151
P.O. Box 3540
Milan, New Mexico 87021

Legal Mail

Pete V. Domenici U.S. Courthouse
333 Lomas Blvd #W, Suite 270
Albuquerque, NM 87102

RECEIVED
UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

JUN 05 2023

MITCHELL R. ELFERS
CLERK

Legal Mail

US POSTAGE
ZIP 87021
02 4W
0000363673